

## USFC2009-1372-27

{4700318B-2A66-4235-A4AD-1006DED1538A}
{117266}{45-110916:114502}{081511}

# AMICUS BRIEF

Nos. 2009-1372, -1380, -1416, -1417

# United States Court of Appeals
# for the Federal Circuit

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

AUG 15 2011

JAN HORBALY
CLERK

AKAMAI TECHNOLOGIES, INC. AND
THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

*Plaintiffs-Appellants,*

v.

LIMELIGHT NETWORKS, INC.,

*Defendant/Cross-Appellant.*

Appeals from the United States District Court
for the District of Massachusetts in Case Nos. 06-CV-11109 and 06-CV-11585,
The Honorable **Rya W. Zobel**, Judge Presiding.

## CORRECTED BRIEF OF *AMICI CURIAE* CISCO SYSTEMS, INC., DELL, INC., EBAY INC., GOOGLE INC., HEWLETT-PACKARD COMPANY, INTEL CORP., INTUIT, INC., MICRON TECHNOLOGY, INC., NETAPP, INC., RINGCENTRAL, INC., SAP AMERICA, INC., SYMANTEC CORP., YAHOO, INC., AND ZYNGA INC. IN SUPPORT OF DEFENDANT/CROSS-APPELLANT

EDWARD R. REINES
NATHAN GREENBLATT
WEIL, GOTSHAL & MANGES, LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Attorneys for Amici Curiae*
Cisco Systems, Inc., Dell, Inc., eBay Inc., Google Inc., Hewlett-Packard Company, Intel Corp., Intuit, Inc., Micron Technology, Inc., NetApp, Inc., RingCentral, Inc., SAP America, Inc., Symantec Corp., Yahoo, Inc., and Zynga Inc.

Dated:  August 31, 2011

## CERTIFICATE OF INTEREST

Counsel for *Amici Curiae* certifies the following:

(1)    The full name of every party or amicus represented by me is:

Cisco Systems, Inc., Dell, Inc., eBay Inc., Google Inc., Hewlett-Packard Company, Intel Corp., Intuit, Inc., Micron Technology, Inc., NetApp, Inc., RingCentral, Inc., SAP America, Inc., Symantec Corp., Yahoo, Inc., and Zynga Inc.

(2)    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

(3)    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: SAP AG.

(4)    No party's counsel authored the brief in whole or in part, and no party or person other than the *amici curiae* contributed money that was intended to fund preparing or submitting the brief.

(5)    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> Edward R. Reines – *Principal Attorney*
> Nathan Greenblatt
> WEIL, GOTSHAL & MANGES LLP
> 201 Redwood Shores Parkway
> Redwood Shores, CA 94065
> (650) 802-3000

Dated:  August 30, 2011

Edward R. Reines

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................... i

STATEMENT OF INTEREST OF *AMICI CURIAE* CISCO SYSTEMS, INC., DELL, INC., EBAY INC., GOOGLE INC., HEWLETT-PACKARD COMPANY, INTEL CORP., INTUIT, INC., MICRON TECHNOLOGY, INC., NETAPP, INC., RINGCENTRAL, INC., SAP AMERICA, INC., SYMANTEC CORP., YAHOO, INC., AND ZYNGA INC. ............................................................... 1

STATEMENT OF AUTHORSHIP AND FUNDING ............................... 2

QUESTION PRESENTED ...................................................................... 2

ARGUMENT ............................................................................................ 2

I.    USE OF ONLY *SOME* STEPS OF A PATENTED METHOD BY AN INDEPENDENT ENTITY SHOULD NOT EXPOSE IT TO DIRECT INFRINGEMENT LIABILITY .................................................... 2

      A.    Expanding Direct Infringement Liability To Ensnare Those Performing Only Unpatented Steps Would Improperly Trench On Legitimate Commerce And Productive Enterprise ...................... 3

      B.    The Threatened Expansion Of Direct Infringement Liability Would Create Unbounded And Disproportionate Damages Exposure .......................................................................... 5

      C.    The Best Cost Avoiders Are The Claim Drafters, Not Commercial Actors Who Are Merely Practicing Unpatented Prior Art Steps ...................................................................... 7

      D.    Allowing Joint Tortfeasor-Based Liability Is Inconsistent With The Statutory Framework For Patent Infringement ........................... 11

      E.    Reading Joint Tortfeasor-Based Liability Into Section 271(a) Would Upend Settled Principles Of Law ........................................... 17

**CORRECTED**

## TABLE OF CONTENTS
### (continued)

Page

F.   Injecting Contributory Infringement Concepts Into Section 271(a) Would Eviscerate Important Safeguards That Protect Legitimate Commerce And Productive Enterprise ............................ 20

G.   The Lack Of Meaningful Limits In Petitioner's Proposed Standards Would Complicate Patent Litigation Further And Exacerbate The Conflict With Section 271(b) And (c)..................... 23

II.   THE PROPER STANDARD TO PROVE THE REQUIRED UNITY OF ACTION FOR DIRECT INFRINGEMENT, WHEN MULTIPLE PARTIES ACT AS ONE, IS THE PANEL'S TEST .................................. 24

CONCLUSION .......................................................................................... 27

PROOF OF SERVICE ............................................................................... 29

CERTIFICATE OF COMPLIANCE .................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Akamai Technologies, Inc. v. Limelight Networks, Inc.,*
629 F.3d 1311 (Fed. Cir. 2010)........................................................ 2, 26

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
365 U. S. 336 (1961) ........................................................ passim

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
377 U.S. 476 (1964)........................................................ 14

*BMC Resources, Inc. v. Paymentech, LP,*
498 F.3d 1373 (Fed. Cir. 2007)........................................ 7, 20, 26

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994).......................................................... passim

*Chef Am., Inc. v. Lamb Weston, Inc.,*
358 F.3d 1371 ........................................................ 10

*Dawson Chemical Co. v. Rohm & Haas Co.,*
448 U.S. 176 (1980)........................................................ 14, 15, 16

*Deepsouth Packing Co. v. Laitram Corp.,*
406 U. S. 518 (1972)........................................................ 7, 17

*Eon-Net LP v. Flagstar Bancorp.,*
No. 2009-1308, Slip. Op. at 200 (Fed. Cir. July 29, 2011) .............. 4

*Global-Tech. Appliances, Inc. v. SEB S.A.,*
563 U.S. __ (2011)........................................................ passim

*Golden Hour Data Systems, Inc. v. emsCharts, Inc.,*
614 F.3d 1367 (Fed. Cir. 2010)........................................ 25

*Janus Capital Group, Inc. v. First Derivative Traders,*
564 U.S. __ (June 13, 2011) ........................................ passim

v

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Metal Film Company v. Metlon Corp.,*
   316 F Supp. 96 ................................................................. 15

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
   545 U.S. 913 (2005)................................................... 3, 26

*On Demand Machine Co. v. Ingram Industries, Inc.,*
   442 F.3d 1331 (Fed. Cir. 2006)..................................... 22

*Peerless Equip. Co. v. WH Miner, Inc.,*
   93 F.2d 98 (7th Cir. 1937) ............................................ 14

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.,*
   520 U.S. 17 (1997)........................................................... 9

## STATUTES

1 U.S.C. § 1 ........................................................... 18, 24

15 U.S.C. §80a-10(a) ................................................... 24

17 C.F.R. § 240.10b-5 .................................................. 12

35 U.S.C. § 271(a)................................................. passim

35 U.S.C. § 271(b) ................................................ passim

35 U.S.C. § 271(c)................................................. passim

35 U.S.C. § 271(d) ....................................................... 16

35 U.S.C. § 271(h) ................................................. 18, 24

## OTHER AUTHORITIES

Harold C. Wegner, *E-Business Patent Infringement: Quest For A Direct
   Infringement Claim Model* ............................................. 8

Giles Rich, *Infringement Under Section 271 Of The Patent Act Of 1952,*
   35 J. Pat. Off. Soc'y 476 (1953) ..................................... 13

## STATEMENT OF INTEREST OF *AMICI CURIAE* CISCO SYSTEMS, INC., DELL, INC., EBAY INC., GOOGLE INC., HEWLETT-PACKARD COMPANY, INTEL CORP., INTUIT, INC., MICRON TECHNOLOGY, INC., NETAPP, INC., RINGCENTRAL, INC., SAP AMERICA, INC., SYMANTEC CORP., YAHOO, INC., AND ZYNGA INC.

*Amici Curiae* Cisco Systems, Inc., Dell, Inc., eBay Inc., Google Inc., Hewlett-Packard Company, Intel Corp., Intuit, Inc., Micron Technology, Inc., NetApp, Inc., RingCentral, Inc., SAP America, Inc., Symantec Corp., Yahoo, Inc., and Zynga Inc. are leading businesses and innovators in the information technology, software, networking, communications, computer, and Internet industries. *Amici* prosecute and maintain thousands of patent assets, and are also frequent targets of patent infringement litigations based on poorly drafted claims requiring more than one actor to perform the steps of an asserted claim. *Amici* frequently rely on this Court's precedent in this area of "divided infringement" to fend off opportunistic litigation that would multiply the number of defendants per case and target products and services as direct infringements when those products and services are merely non-infringing staples of legitimate commerce. *Amici* thus have a strong interest in maintaining and improving the clear body of "divided infringement" patent law consistent with the choices made by Congress in the Patent Act as reflected in the statutory scheme of Section 271.

In sum, this appeal presents important issues that affect the technology community broadly, and, by extension, the public. *Amici* hope that their views are of value to this Court in considering these issues *en banc*.

## STATEMENT OF AUTHORSHIP AND FUNDING

No party's counsel authored the brief in whole or in part, and no party or person other than the *amici curiae* contributed money that was intended to fund preparing or submitting the brief.

## QUESTION PRESENTED

If separate entities each perform separate steps of a method claim, under what circumstances would that claim be directly infringed and to what extent would each of the parties be liable?

## ARGUMENT

### I. USE OF ONLY *SOME* STEPS OF A PATENTED METHOD BY AN INDEPENDENT ENTITY SHOULD NOT EXPOSE IT TO DIRECT INFRINGEMENT LIABILITY

As the panel in this case explained, the "settled" rule is that "direct infringement requires a single party to perform every step of a claimed method." *Akamai Technologies, Inc. v. Limelight Networks, Inc.,* 629 F.3d 1311, 1318 (Fed. Cir. 2010). It follows from this "single party" principle that, for there to be direct infringement liability where there is more than one entity performing the claimed steps, every step must be legally "attributable" to only one party. *Id.* at 1319. A

roll-back of these established rules by this Court, as sought by Akamai, would threaten legitimate commerce, complicate already dysfunctional multi-party litigation, violate the statutory scheme set forth by Congress, and contradict Supreme Court precedent in cases such as *Central Bank* and *Janus*.

### A. Expanding Direct Infringement Liability To Ensnare Those Performing Only Unpatented Steps Would Improperly Trench On Legitimate Commerce And Productive Enterprise

A balanced and sustainable patent system must not discourage legitimate commerce and productive enterprise. As recently stated in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919 (2005), when defining the scope of infringement liability, the Supreme Court is "mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential." In *Grokster*, the Court explained that liability for the use of unpatented components must rest "on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise." *See id.* Again, in *Global-Tech. Appliances, Inc. v. SEB S.A.*, 563 U.S. __ (2011), the Supreme Court, referencing *Grokster*, recently explained that, before the use of unpatented components could support infringement liability there must be "purposeful, culpable expression and conduct."

*Amici* are leading technology companies at the heart of the American economy whose products and services are used as components and elements of larger products, networks, and systems. Expanding direct infringement claims, as appellants seek, to cover use of products and services to perform steps which are not themselves patented, and which are often old and in the prior art, would stifle commerce and place further upward pressure on product costs by allowing for opportunistic litigation in which more and more market participants that touch a multi-feature product or system or network are sued together. Likewise, opportunistic plaintiffs would pursue even more companies to seek cost-of-defense style settlements from each.

For instance, with the incentive of plaintiffs to pull multiple parties into litigation, and the power to draft claims to add prior art steps to a method, multi-actor patent claims will be the goal, rather than the drafting error to be avoided that it is now. Indeed, one could envision dependent claims whose sole purpose is to add prior art steps precisely to increase the patent applicant's litigation and licensing options post-issuance. This would increase the number of parties per case and exacerbate the existing problems attendant to mass defendant litigation that *amici* and many other technology companies face today.

In addition, the current problem with opportunistic plaintiffs seeking nuisance value settlements from an operating company's entire supply chain—

including distributors, suppliers, customers, end users, and others—would be worsened by allowing multi-actor patent claims and infringement based on ill-defined common law tort theories. *See, e.g., Eon-Net LP v. Flagstar Bancorp.*, No. 2009-1308, Slip. Op. (Fed. Cir. July 29, 2011) at 22-25 (recognizing the problematic economics of nuisance value settlements and the potential for abuse of the patent system). Under Akamai's proposal, the hundreds if not thousands of contracts in a technology company's supply chain could expose each actor in that supply chain to potential patent infringement liability—even if that actor were performing nothing more than a prior art method step. Such a drastic expansion in potential liability will benefit opportunistic non-practicing entities with no downside of a countersuit, and will harm American industries that are extorted into paying for the practice of method steps that by themselves do not infringe any patent claim.

## B. The Threatened Expansion Of Direct Infringement Liability Would Create Unbounded And Disproportionate Damages Exposure

Creating direct infringement liability for using less than the full patented method threatens to create unbounded and disproportionate liability for acts of others because, under the theory expressed by Akamai, damages exposure would be joint and several and cover the use of the entire patented method. *See* Akamai.

Br. 38. Indeed, Akamai has not identified any way to control exposure so that the use of an old and unpatented step would lead, as it should, to no damages at all.

Creating direct infringement liability for using less than the full patented method would also further complicate damages issues by inviting multi-actor direct infringement theories. Patentees would no doubt look to all actors in aggregate to expand the damages base and would selectively pick Georgia Pacific factors from this larger group. Imposing joint and several liability does not alleviate the problem. Before joint and several liability attaches there must be a damages *figure*, and before there is a figure there must be a *theory*. Akamai's proposal lacks any such theory but instead raises more questions than it answers. What damages would be appropriate for an entity that only practices a prior art step of a claim? If greater damages are appropriate for an entity that practices the "novel" steps of a claim, how should the "novel" steps be determined? Alternatively, if Akamai proposes that damages would be determined via a multi-party hypothetical negotiation, how would such a negotiation be conducted? Inviting complicated damages theories in multi-actor joint infringement scenarios under the already accommodating Georgia Pacific factors is a recipe for unbounded and disproportionate liability.

At the same time, Akamai concedes that its approach would "technically" cause a consumer performing a prior art step to be a direct infringer if it "knew that

its actions may be combined with another's." Akamai.Br.39. Consumer liability for direct infringement merely for using unpatented steps would create cause for concern, as Akamai acknowledges. *Id.* ("Further, there are ways to protect such consumers."). Akamai's putative solution to invoke the so-called *de minimis* infringement exception to mitigate the overbreadth of this approach illustrates its folly. A sound legal standard would not need to rely on an *ad hoc* expansion of a narrow, judge-made exception to statutory authority.

## C.    The Best Cost Avoiders Are The Claim Drafters, Not Commercial Actors Who Are Merely Practicing Unpatented Prior Art Steps

As this Court has acknowledged, proper claim drafting can normally avoid divided infringement issues. *See BMC Resources, Inc. v. Paymentech, LP*, 498 F.3d 1373, 1381 (Fed. Cir. 2007) ("The concerns over a party avoiding infringement by arms-length cooperation can usually be offset by proper claim drafting.").

Moreover, patent applicants have long been on notice of the need to draft claims to cover the activity of one entity, rather than multiple actors. At least by the Supreme Court's 1961 decision in *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U. S. 336, 349 (1961), and its 1972 holding in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U. S. 518, 528 (1972), the principle that a party performing less than all the limitations of a claim does not infringe was firmly ensconced in the law. Even before those decisions, the 1952 Act unmistakably

7

separated the primary liability provisions governing direct infringement from the secondary liability provisions governing performance of less than all of the limitations of a claim. *See infra*; *compare* McKesson.Br.49 (speculating that "[t]here are probably thousands of such patents" that "contemplate action by more than one entity.").

As computer networking became more relevant to commerce, claim drafting seminars schooling patent prosecutors on how to prepare claims to avoid divided infringement problems became commonplace. For example, one particularly prolific claim drafting expert, Professor Hal Wegner, was conspicuously vocal on this issue with an extended guide on how to avoid divided infringement in a variety of scenarios. *See, e.g.*, Harold C. Wegner, *E-Business Patent Infringement: Quest For A Direct Infringement Claim Model*, November 21, 2001, found at http://www.softic.or.jp/symposium/open_materials/10th/en/wegner-en.pdf.

Indeed, in his 2001 lecture, Professor Wegner dedicated an entire presentation to proper claim drafting to avoid divided infringement issues. *Id.* at ("Keeping in mind the goal of having a single, direct infringer for every claim as the starting point...").

*Amici* collectively have a large body of experience patenting in computer networking and related areas, and while they do not purport to be perfect with their results, that experience teaches that claim drafting can solve virtually all of the

issues raised by Akamai. If patenting in *Amici*'s areas of technology were materially impeded by the existing Federal Circuit law of divided infringement, obviously they would not be submitting this supportive brief.

Akamai argues that demanding improved claim drafting to address this issue would somehow exalt "form over substance." *See* Akamai.Br.36. This argument is off-base. Akamai *never* denies that claims can be drafted to avoid divided infringement problems. *Id.* at 35 (criticizing this Court's decisions because they demand "wordsmithing" and "foresight" from patent drafters). And it is not meaningless to require proper claim drafting directed at a single actor. Such drafting provides fair notice to commercial actors in a way that multi-actor drafting does not. *See Aro*, 365 U.S. at 357-59 (Black, J., concurring) ("But to what avail these congressional precautions if this Court, by its opinions, would subject small businessmen to the devastating uncertainties of nebulous and permissive standards of infringement under which courts could impose treble damages upon them for making parts, distinct, separable, minor parts, or even major parts of a combination patent, upon which parts no patent has been or legally could have been issued."); *see also Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 24 (1997) (noting "this Court's numerous holdings that it is the claim that defines the invention and gives notice to the public of the limits of the patent monopoly."). *Amici* frequently receive letters alleging infringement, and analyzing such

allegations is difficult and costly. Under Akamai's proposal, it would be more difficult and costly still. Akamai offers no explanation for how a company should analyze whether it practices one part of the claim, and if so, whether one or more independent third-parties practice the remaining steps, and if so, whether the relationships between the entities satisfies an ill-defined standard such as "acting in concert." Claims are supposed to give clear notice—not create a boundless morass of uncertainty that hampers rather than fosters innovation.

Akamai and the McKesson dissent further argue that "[a] patent that cannot be enforced on any theory of infringement, is not a statutory patent right. It is a cynical, and expensive, delusion to encourage innovators to develop new interactive procedures, only to find that the courts will not recognize the patent because the participants are independent entities." Akamai.Br.32, 34 (quoting *McKesson*, No. 2010-1291, Slip Op. at 17 (Newman J., dissenting)). This argument falsely assumes that Akamai's patent cannot be enforced against anyone on any theory, falsely assumes that Akamai drafted its patent intending to cover a joint infringement scenario, and falsely assumes that the PTO reviews patents for divided infringement problems.

As discussed above, at the time Akamai drafted its claims, it had no legitimate expectation that its patent could be enforced on a theory of joint direct infringement. In fact, the divided infringement "problem" in Akamai's claims

10

appears to be due to a conscious choice or a drafting error rather than a fundamental deficiency in the law. Indeed, there is no reason to believe that Akamai did not draft its claims specifically to cover a business model whereby an entity such as Akamai would tag objects for its customers. Alternatively, while drafting errors are unfortunate, it is not the function of the courts to correct them— particularly not by making fundamental changes to the law. *Chef Am., Inc. v. Lamb Weston, Inc.*, 358 F.3d 1371, 1374 ("This court, however, has repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity."). Finally, it is not the function of the PTO to engage in hypothetical speculation as to whether a claim can ever be infringed, such as whether a sufficient legal relationship could possibly exist between various actors for their actions to be considered that of a single legal entity. It is for the party drafting the claims to consider such issues and draft the claims appropriately.

### D. Allowing Joint Tortfeasor-Based Liability Is Inconsistent With The Statutory Framework For Patent Infringement

Akamai proposes to capture an actor performing unpatented steps as a direct infringer if it is deemed to "direct or control" another, "act-in-concert" with another, or "knowingly combine" steps with another. Akamai.Br.20-30; *see also McKesson*, Slip Op. at 12 (Newman, J., dissenting) (urging a standard based on "participation and combined actions"). These standards have no statutory basis.

To the contrary, such standards *undermine* the statutory scheme because they would disregard and override the safeguards set forth in Sections 271(b) and (c), which regulate infringement claims against actors that do not perform all steps of a patented invention.

Where, as here, Congress has created a statutory scheme regulating private liability, overlapping common law tort theories should not be created. In circumstances remarkably parallel to those presented in this case, the Supreme Court has expressed strong distaste for the creation of extra-statutory common law tort theories to be superimposed on a statutory scheme. In *Central Bank*, the Supreme Court stated that "[t]he fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 184 (1994) ("when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.").

The Supreme Court very recently reaffirmed this principle in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. __ n.6 (June 13, 2011). In *Janus*, a mutual fund (Janus Investment Fund) advised and administered by a separate legal entity (Janus Capital Management LLC, "JCM") issued a prospectus that

allegedly violated Rule 10b-5 of the securities laws, which makes it unlawful "for any *person*, directly or indirectly, . . . [t]o make any untrue statement of material fact" in connection with the purchase or sale of securities. *Janus*, 564 U.S. at __. After investors sued JCM, the Fourth Circuit held that the complaint stated a viable claim for relief, reasoning that "JCM, by participating in the writing and dissemination of the prospectuses, *made* the misleading statements contained in the documents." *Id.* ("JCM 'played a role in preparing or approving the content of the Janus fund prospectuses'"). In other words, the Fourth Circuit allowed the suit to proceed essentially on a theory of concert of action, whereby JCM and the fund jointly "made" the same statements in the prospectuses.

The Supreme Court reversed. The Supreme Court cautioned that, where Congress distinguishes between primary and secondary liability in a statute, a broad reading of the primary liability provisions "would substantially undermine" the statutory scheme: "for Central Bank to have any meaning, there must be some distinction between those who are primarily liable . . . and those who are secondarily liable[.]" *Id.* at n.6.

Here, Akamai's "act in concert" standard mirrors the standard rejected by the Supreme Court in *Janus*, and should be rejected for similar reasons. *See* Akamai.Br.2 ("parties are acting in concert when they act in accordance with an implied or express agreement to cooperate in a particular line of conduct."). *Janus*

13

also shows that, on the questions relevant here, the Supreme Court does not have any "preference for flexible standards" or "preference for applying common law doctrines," but rather honors Congressional choices codified in a duly enacted statutory scheme. *See* Akamai.Br.30. This potent and recent authority is an important lodestar for the resolution of this case.

Congress enacted Section 271 with subsections (b) and (c) in 1952 to codify common law joint tortfeasor principles of contributory infringement. Giles Rich, *Infringement Under Section 271 Of The Patent Act Of 1952*, 35 J. Pat. Off. Soc'y 476, 480 (1953) ("Contributory infringement is an expression of the old common law doctrine of joint tort feasors"). As reiterated most recently in *Global-Tech*, "[b]efore 1952, both the conduct now covered by §271(b) (induced infringement) and the conduct now addressed by §271(c) (sale of a component of a patented invention) were viewed as falling within the overarching concept of 'contributory infringement.'" *See Global-Tech. Appliances, Inc. v. SEB S.A.*, 563 U.S. __ (2011).

Indeed, the point of subsections 271(b) and (c) was to crystallize the murky common law of joint tortfeasor liability as applied to patent law. *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 203-04 (1980) (sections 271 (b) and (c) "were intended to codify in statutory form the principles of contributory infringement and at the same time [to] eliminate . . . doubt and confusion that had

14

resulted from decisions of the courts in recent years.") (internal quotations omitted); *Aro II*, 377 U.S. 476 (1964).

Importantly, the pre-1952 "overarching concept of contributory infringement" encompassed the very type of conduct at issue in this case—performance of all but one step of a method claim. *See Peerless Equip. Co. v. WH Miner, Inc.*, 93 F.2d 98, 105 (7th Cir. 1937) ("In this the District Court found appellant guilty of *contributory* infringement of each of the process claims, and we think that finding is correct."); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 500 (1964) ("a contributory infringer is a species of joint-tortfeasor").[1]    Congress's deliberate choice to address the pre-1952 overarching concept of contributory infringement in sections 271(b) and (c) means that courts must apply those statutes—not generalized, common law joint tortfeasor concepts—to address the conduct at issue in this case.[2]

---

[1]    *Global-Tech* provides additional examples of the scope of the pre-1952 contributory infringement doctrine. *See Global-Tech*, 563 U.S. __ at n.3.  The cases cited by Akamai are ambiguous as to whether they rely upon pre-1952 doctrines of direct or contributory infringement, and their reasoning is brief or nonexistent. *See, e.g., Metal Film Company v. Metlon Corp.*, 316 F Supp. 96, 110 n.12 (citing *Cromwell v. Baker Oil Tools*, 143 F.2d 1003, 1004 (9th Cir. 1944) (stating that "[i]t is obvious that one may infringe a patent if he employ an agent for that purpose or have the offending articles manufactured for him by an independent contractor.")).

[2]    Even some amici urging reversal agree with this proposition. *See, e.g.,* Biotechnology.Br.21 ("Patent law liability for inducement or contributory

Although the clash between Akamai's common law joint tortfeasor approach and the statutory scheme of Section 271 is manifest, Akamai nevertheless relegates discussion of this topic to the depths of its brief. Even there, it expends only a few sentences attempting to defend its position. Akamai essentially proposes re-interpreting section 271(a) to proscribe certain forms of pre-1952 contributory infringement that Congress deliberately chose *not* to proscribe in the relevant part of the statute when it set out to eliminate "the doubt and confusion" in the common law caused by inconsistent judicial decision-making. *Dawson*, 448 U.S. at 203-04. However, the fact that sections 271(b) and (c) do not proscribe each and every form of contributory infringement that was recognized in pre-1952 law does not mean that other parts of the statute must proscribe that conduct, as Akamai implies. *E.g.*, Akamai.Br.32, 35 ("there is no reason for not protecting inventions of this type."). Instead, it merely reflects a "deliberate congressional choice" "to impose some forms of secondary liability, but not others." *Central Bank*, 511 U.S. at 184; *see also Dawson*, 448 U.S. at 203-04 (stating that sections 271(b), (c), and (d) were also "intended . . . [to] eliminate . . . doubt and confusion that had resulted from decisions of the courts in recent years.").[3]

---

infringement, on the other hand, provides an easier fit with common-law liability theories for inducing or aiding and abetting another's tort.")

[3] Citing *Dawson*, McKesson argues that 271(b) and (c) "expand[ed] significantly the ability of patentees to protect their rights." McKesson.Br.49. *Dawson*, however, makes clear that any "expansion" in "the ability of patentees to protect

While Section 271 could have included a clause imposing liability in the circumstances Akamai envisions, it does not. Where Congress deliberately chose not to impose that form of secondary liability in 271(b) or (c), it would be improper for this Court to now reinterpret 271(a) to effectively override the existing statutory scheme. *Id.*

## E.    Reading Joint Tortfeasor-Based Liability Into Section 271(a) Would Upend Settled Principles Of Law

By reading into Section 271(a) common law concepts of contributory infringement explicitly addressed by Sections 271(b) and (c), Akamai's ill-conceived proposal would substantially undermine *all three* sections and would upend settled principles of law in the process. Section 271(a) identifies the acts that constitute direct infringement and its text requires a single entity to use the complete "patented invention" before there is liability. *See* 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any *patented invention* . . . infringes the patent."). The Supreme Court has repeatedly stated that direct infringement under 271(a) requires all elements of a claimed invention to be

their rights" came through limiting the misuse doctrine via enactment of 271(d), not via some all-encompassing definition of contributory infringement in 271(b) and (c). *See Dawson*, 448 U.S. at 214 ("the legislative history reveals that § 271(d) was designed to retreat from *Mercoid* in this regard."). At the same time, *Dawson* confirms that the legislative materials "sufficiently demonstrate that the 1952 Act did include significant substantive changes, and that § 271 was one of them." *Id.* at 204 (stating that the main purpose of enacting 271(b), (c), and (d) was "clarification and stabilization.").

used, not just some: "[i]f anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that *no element, separately viewed, is within the grant.*" *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U. S. 336, 349 (1961); *see also Deepsouth Packing Co. v. Laitram Corp.*, 406 U. S. 518, 528 (1972) ("we have so often held that a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts.").[4] The text of Section 271(a) is clear that "use" liability, for example, is triggered only by whoever uses the "patented invention," and not some fraction of it.   While there might be multiple users, the statute by its express terms only reaches those that use the complete "patented invention."[5]

---

[4] In *Aro*, the Supreme Court held that a party supplying a component of a combination patent could not be held liable for direct infringement, even though its business was based on "manufactur[ing] and sell[ing] replacement fabrics designed to fit the models of convertibles equipped with tops embodying the combination covered by the patent in suit." *Aro*, 365 U.S. at 337-39.

[5] 35 U.S.C. § 271(h) implies that the term "whoever" refers to a single entity (defining "whoever" as ordinarily "any nongovernmental entity").  1 U.S.C. § 1, which states that "words importing the plural include the singular," proves nothing. Even if 271(a) were re-written in the plural, it proves nothing more than the fact that there can be multiple infringers, *i.e.*, multiple entities that each perform the entire patented method.  *See* 35 U.S.C. § 271(a) ("[whatever persons] without authority make[], use[], . . . any patented invention . . . infringe[] the patent.").  The further statement in 1 U.S.C. § 1 that "the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals" on its face says nothing about whether "person" or "whoever" can be singular or plural, but simply indicates different types of legal entities each can be.  In brief, the *en banc* question is not answered

There are *other* provisions of Section 271 that create potential liability for using less than the complete patented invention.

Contrary to settled principles and precedent, Akamai's "act-in-concert" or "knowingly combine" standard would impose liability on entities that use less than the complete invention. *Compare* McKesson.Br.35-36 (arguing that patients would be liable for patent infringement for performing the prior-art step of "initiating a communication") *with Aro*, 365 U.S. at 345 ("The basic fallacy in respondent's position is that it requires the ascribing to one element of the patented combination the status of patented invention in itself."). Thus, Akamai's proposed standard would upend the settled principle that use of less than a complete invention does not constitute infringement under section 271(a).

In addition, Akamai's proposed standard would upend the settled principle that "a direct infringer's knowledge or intent is irrelevant." *Global Tech.*, 563 U.S. __ at n.2. Both its proposed "concert of action" and "knowingly combine" standards for joint direct infringement feature ill-defined scienter requirements. Akamai implicitly acknowledges this by proposing a number of *ad hoc* exceptions to protect "innocent" infringers that again depend on the state of mind of commercial actors. *See* Akamai.Br.37 ("But this does not mean that the directed or

---

by a dubious interpretation of the word "whoever." Akamai.Br.15; McKesson.Br.46.

controlled party, who may have acted innocently and unknowingly . . . is necessarily liable.").

Akamai proposes to replace the settled principle that a direct infringer's knowledge or intent is irrelevant with a framework that makes state of mind a crucial focus. This cannot be squared with long-standing Supreme Court precedent. Conversely, Akamai's focus on such state of mind requirements further confirms that sections 271(b) and (c)—not 271(a)—provide the relevant framework for addressing the conduct that Akamai seeks to proscribe.

### F.   Injecting Contributory Infringement Concepts Into Section 271(a) Would Eviscerate Important Safeguards That Protect Legitimate Commerce And Productive Enterprise

Akamai's proposed standard would also substantially undermine the statutory scheme for secondary liability by creating rules inconsistent with Sections 271(b) and (c). As both this Court and commentators have recognized, "expanding the rules governing direct infringement to reach independent conduct of multiple actors would subvert the statutory scheme." *BMC Resources, Inc. v. Paymentech, LP*, 498 F.3d 1373, 1381 (Fed. Cir. 2007).

In particular, sections 271(b) and (c), not section 271(a), set forth the circumstances when someone performing less than all the elements of a claimed invention can nevertheless be responsible for a complete direct infringement. Section 271(b) regulates when encouragement of direct infringement creates

liability for an entity that does not engage in an unauthorized and complete act of direct infringement. As the Supreme Court recently held in *Global-Tech*, Section 271(b) includes important safeguards for accused infringers including "knowledge that the induced acts constitute patent infringement" and additional requirements under a theory of willful blindness. *Global-Tech. Appliances, Inc. v. SEB S.A.*, 563 U.S. __ (2011) ("We think these requirements give willful blindness an appropriately limited scope . . ."). Similarly, Section 271(c) regulates when acts relative to components of an invention short of an unauthorized and complete act of direct infringement can nevertheless give rise to liability. Subsection (c) includes a host of safeguards to protect those that use unpatented elements of a combination patent, including that the component be "material" to the invention and that there is knowledge of the patent. *See id.*

Akamai's proposed standard would gut these protections. For example, suppliers of immaterial components could be held liable under theories of "acting in concert," by virtue of having signed a standard supply agreement with an entity producing the complete infringing article. Such a result would not only bypass all the protections of section 271(b), but it would substantially undermine the notice function of the patent system. *See Aro*, 365 U.S. at 357-59 (Black, J., concurring). As a second example, entities performing only some steps of a method claim

would be liable for infringement, despite total absence of knowledge of the patent as required by Sections 271(b) and (c).

Akamai's only response does not address how its proposed "act-in-concert" and "knowingly combine" standards would co-exist in harmony with the statutory scheme of Title 35. Akamai essentially argues that its proposal does not render section 271(c) *entirely* meaningless, because it would still apply in some situations. *See* Akamai.Br.31. Of course, rendering the statute meaningless in some situations still subverts the statutory scheme. That result is impermissible. Moreover, Akamai bases its argument on the flawed assumption that jointly performing the steps of a method claim must be prohibited somewhere in the statute, *i.e.*, in 271(a) if not 271(c). However, as demonstrated above, Congress enacted 271(b) and (c) to address the "overarching concept of contributory infringement," and the absence of liability for performing less than the complete method claim must be respected as a "deliberate congressional choice" "to impose some forms of secondary liability, but not others." *Central Bank*, 511 U.S. at 184. In short, Akamai's proposed standards would impermissibly undermine sections 271(b) and (c) by setting up a parallel set of extra-statutory rules with ill-defined standards.

**G.    The Lack Of Meaningful Limits In Petitioner's Proposed Standards Would Complicate Patent Litigation Further And Exacerbate The Conflict With Section 271(b) And (c)**

It would not only subvert the statutory scheme to read "vicarious" joint tortfeasor-based liability into section 271(a), as explained above, but the fuzzy and inconsistent standards proposed by the McKesson dissent and Akamai would exacerbate that conflict. *See McKesson* Slip Op. (dissent); *On Demand Machine Co. v. Ingram Industries, Inc.*, 442 F.3d 1331 (Fed. Cir. 2006) *(dicta)*.[6]

The McKesson dissent's "participation and combined" test is vague and lacks meaningful support in authority.    Even petitioners do not support that standard.    Indeed, it closely mirrors the standard rejected in *Janus* in a parallel context.    *Compare McKesson*, Slip Op. at 12 (Newman, J., dissenting) (urging recognition of standard based on "participation and combined action(s)") *with Janus*, 564 U.S. at __ (rejecting standard for primary liability based on "participati[on]" and "play[ing] a role" in the proscribed conduct).

Akamai's proposed standard likewise lacks sensible boundaries.    Under Akamai's proposal, those who "act in concert . . . or pursuant to a common design"

---

[6]    The appellants and *amici* propose many different formulations of the supposedly well-settled test for joint tortfeasor liability, namely:    (1) direction or control, Akamai.Br.20; (2) acting in concert, Akamai.Br.23; (3) knowingly combining, Akamai.Br.30; (4) inducing, McKesson.Br.28; (5) "participation and combined action(s)," McKesson Slip Op. at 12; (6) "partial inducement," Cascade.Br.25; (7) proximate causation, Aristocrat.Br.13 & Boston.Br.10; (8) nature of actions performed, relative position of actors, and fairness, Biotechnology.Br.19.

will be held liable.  Akamai.Br.23. The common design "may be implied and understood to exist from the conduct itself." *Id.*   The standards are "flexible," and evidence of control "may be very attenuated."  Akamai.Br.21-22. Such "flexible" standards would expand patent infringement liability and unduly complicate the determination of infringement for thousands of companies by requiring an analysis of whether part of an invention was used, and if so, whether others used the remainder, and if so, what relationship existed between each entity.  Nor does Akamai address new claims for indirect liability that would follow from an expanded definition of direct infringement, such as liability for inducing a party to perform a portion of a method or liability for selling a component of an apparatus for practicing a portion of a method.  Even a cursory look at the tangled web of new possibilities exposes the weakness of Akamai's proposal.  Congress created no such legal labyrinth and this Court should not countenance it.

## II.    THE PROPER STANDARD TO PROVE THE REQUIRED UNITY OF ACTION FOR DIRECT INFRINGEMENT, WHEN MULTIPLE PARTIES ACT AS ONE, IS THE PANEL'S TEST

Given the law and logic supporting the single actor rule for direct infringement, it remains to define what properly constitutes a single legal entity.

Fortunately, the statute itself, informed by familiar principles of law, answers that question.  As used in section 271, the term "whoever" includes "any nongovernmental entity."  35 U.S.C. § 271(h).  It includes a corporation, a

company, an association, a firm, a partnership, a society, a joint stock company, and an individual. 1 U.S.C. § 1. Other statutes and a developed body of corporate law define when two entities are legally separate. *See, e.g., Janus*, 564 U.S. at __ (describing how "Janus Investment Fund is a separate legal entity" because it "has no assets apart from those owned by the investors" and it maintains an independent board of trustees in compliance with 15 U.S.C. §80a-10(a)). For instance, the panel's agency test establishes when a principal is performing the "patented invention" by employing an agent, relying on well-established principles and a developed body of law. Panel Op. at 15-16. Likewise a contract that *requires* an actor to perform an act on behalf of a mastermind can satisfy the single actor rule if the contractee is merely an extension of the mastermind. An example of this would be an employee acting within the scope of her or his employment as an instrumentality of an employer under the familiar doctrine of *respondeat superior*. In these instances, all acts can comfortably be said to be performed by one responsible party.

Akamai conjures up a parade of horribles that would supposedly result from "unduly restricting joint infringers" to agency or contract law. *See* Akamai.Br.33. For instance, Akamai cites *Golden Hour Data Systems, Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1380-81 (Fed. Cir. 2010) as an example of a purported "loophole" in the law that allows companies to evade liability by forming a "strategic

partnership." *Id.* This example is self-defeating because the evidence in *Golden Hour* "was insufficient for the jury to infer control or direction," not because forming a partnership necessarily evades liability. *Id.* at 1380-81. Indeed, when given its formal meaning, a partnership is a single legal entity explicitly within the bounds of the statute. Similarly, an employer directing several employees to each perform different steps of a patented method could be responsible as a single unit under well-established principles of law. Besides being recognized by the statute, these established principles provide clear boundaries for infringement liability in a way that the loose "act-in-concert" and "knowingly combine" standards do not.

On the other hand, under the statute and well-accepted principles of contract law, arms-length contracts are insufficient to establish that two parties are acting as one, as explained in *BMC*, *MuniAuction*, and by the *Akamai* panel. A low standard requiring only "instructions" to a customer on use would create liability for what is essentially inducing infringement without the Supreme Court mandated safeguards such as the required culpable knowledge that a legal wrong is being promoted. *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U. S. 913, 937 (2005) ("[t]he inducement rule . . . premises liability on purposeful, culpable expression and conduct.").

Application of corporate, agency, and partnership law, and other principles of law recognized in section 271 should be left to the trial courts in cases where

**CORRECTED**

such facts are at issue, rather than in an *en banc* proceeding of this Court where liability for direct infringement is not premised on any theory supported by the statute.

## <u>CONCLUSION</u>

For the aforementioned reasons, the district court's judgment should be affirmed.

Dated: August 30, 2011

Respectfully submitted,

Edward R. Reines
Nathan Greenblatt
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Attorneys for Amici Curiae*

## PROOF OF SERVICE

I certify that on August 31, 2011, this brief was served by hand delivery for filing with the Clerk of the Court, and that on that same date I served two copies on counsel listed below in the manner indicated below:

*Via Hand Delivery*
Donald R. Dunner
Kara F. Stoll
Finnegan, Henderson,
Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, DC 20001
Telephone: (202) 408-4000

*Via Federal Express*
Jennifer S. Swan
Finnegan, Henderson,
Farabow, Garrett & Dunner, LLP
3300 Hillview Ave.
Palo Alto, CA 95062

*Attorneys for Plaintiff-Appellant*
*Akamai Technologies, Inc.*

*Via Federal Express*
Of Counsel
Robert S. Frank, Jr.
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110

*Attorney for Plaintiff-Appellant*
*The Massachusetts Institute of*
*Technology*

*Via Federal Express*
Robert G. Krupka
Kirkland & Ellis LLP
777 South Figueroa Street, Suite 3700
Los Angeles, CA 90017

*Attorney for Defendant/Cross-Appellant*
*Limelight Networks, Inc.*

Dated:  August 31, 2011

Alvaro Parrado
WEIL, GOTSHAL & MANGES LLP

29

**CORRECTED**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 29(d) and 32(a)(7)(B) because it contains 6,197 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2002, Office XP in Times New Roman, 14 point.

Dated:  August 30, 2011

_____
Edward Reines