KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3209
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

September 25, 2015

Daniel E. O'Toole
Clerk of the Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

  Re: *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, Nos. 2009-1372, -1380, -1416, -1417

Dear Mr. O'Toole:

**I. Limelight Does Not Infringe Because It Does Not "Tag" Embedded Objects**

  This Court held that the '645 patent "limits **tagged** alphanumeric strings to those strings including the object's original URL," because the patent specification makes clear that this was "the invention." *Akamai I*, 629 F.3d at 1326 (emphasis added); *see* Limelight Letter 2-3. Limelight's service does not involve "tagging" of embedded objects under this construction – that much is undisputed. This holding applies equally to the asserted claims of the '703 patent; furthermore, Limelight properly preserved this claim of error by pressing it – repeatedly – in the district court.[1]

  Akamai focuses on the stipulated construction. But, as Limelight has made clear, that stipulation does not specify how the pointer or hook is provided. Thus, in contrast with the district court's effective removal of the "optimal server" restriction (discussed below), limiting the "tagging" term to its proper scope – as confirmed by this Court's ruling in *Akamai I* – is entirely consistent with the parties' stipulation. Contrary to Akamai, Limelight did not, based on that early stipulation, give up any right to argue that further construction or interpretation of tagging would be needed. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) (holding that, though the parties initially agreed to the meaning of a term, a "dispute [over] the scope of that claim term" required the district court to further construe the term for the jury).

---

[1] Akamai waived any challenge to the Panel's construction of the '645 patent by failing to seek review. *See* Limelight Letter 1 n.1. Its suggestion (at 5) that the Panel's ruling in this regard is erroneous reinforces the conclusion that its claims under the '703 patent fail for the same reason as its claims under the '645 patent.

Mr. Daniel E. O'Toole
September 25, 2014
Page 2

     **1.**     Nothing in the '703 patent supports Akamai's assertion that the word "tagging" claims a broader invention than "associat[ing] . . . an alphanumeric string" in the '645 patent. *First*, the fact that tagging ensures that the requests for the object "resolve" to the CDN domain rather than the content provider domain is no distinction: the same is true of associating the alphanumeric string in the '645 patent. *See* '645 patent cl. 1 ("the alphanumeric string is resolved without reference to a filename for the given object"). Likewise, both patents require that objects be served from the CDN; the only method that the patent claims for doing so is to include the original URL in the tagged URL. That is what this Court held in *Akamai I*, rejecting – based on the same specification at issue here – the exact argument Akamai now seeks to revive. *See* 629 F.3d at 1328-29.

     *Second*, Akamai's claim-differentiation argument (at 3-4) fails because none of the cited claims merely adds a prepending limitation. Claim 17 adds not only "prepending given data to a content provider-supplied URL" but also "*to generate an alternate resource locator (ARL)*." '703 patent 18:60-61 (emphasis added). The pertinent difference from the more general concept of "tagging" is the generation of the ARL, not the prepending; furthermore, claim 17 specifies that the original object's URL was supplied by the content provider, rather than the CDN. Claim 23 is differentiated because the tagging must occur "at the content provider server" – which is not an element of claim 19. There is no redundancy, and no claim is rendered "nonsensical."

     *Third*, Akamai's argument (at 4) that tagging need not include the original object's URL because "tagging" does not involve retrieving the object is, again, an argument that this Court already rejected in *Akamai I*. *See* 629 F.3d at 1315; *see also id.* at 1328-29 (rejecting identical argument). Akamai's assertion (at 4) that there are additional ways to retrieve an object is unavailing because the patent only discloses *one* way – that is, including the original URL in the modified URL. As the Panel previously explained, "the written description specifically refers to strings including the object's original URL as 'the invention.'" 629 F.3d at 1326. Nor does it matter that, in claim 34, the step of delivering the embedded object is not included – as Akamai itself recognizes, the meaning of "tagging" is consistent throughout the claims.

     *Fourth*, Akamai's briefs before the Panel repeatedly treated "tagging" and "associat[ing] . . . an alphanumeric string" as equivalent. *See, e.g.*, Akamai Blue Br. 29; *id.* at 52; Akamai Yellow Br. 20; *see also Akamai I*, 629 F.3d at 1326. That reflects the patents and their shared specification: the point of tagging is to modify the object's URL so that the object can be located on the CDN servers, rather than the content provider's servers. *See* '703 patent 19:11-13. The alphanumeric string is the end result of that modification. *See* '645 patent 17:54-57.

     *Fifth*, it does not matter that the jury did not invalidate the patent for lack of written description. Whether Limelight proved at trial by clear and convincing evidence that the claims were invalid does not affect the understanding of the patents that this Court adopted in *Akamai I*.

     **2.**     Limelight properly preserved this argument. The stipulation, as explained above, does not resolve the issue, and Limelight timely (and repeatedly) raised this question before the

Mr. Daniel E. O'Toole
September 25, 2014
Page 3

district court. Akamai argues (at 1-2) that Limelight waived these issues because it did not move for reconsideration of the district court's *Markman* order or seek summary judgment on the issue. But the construction of the "tagging" term was not at issue in the *Markman* hearing, and the district court largely *adopted* Limelight's proposed construction of the "associated with an alphanumeric string" limitation in the '645 patent, apparently resolving this issue in Limelight's favor. Further, Limelight had no procedural obligation to move for summary judgment on any particular ground, and it does not challenge the district court's summary judgment ruling; it therefore could not waive a legal issue by failing to raise it in its summary judgment motion. *See*, *e.g.*, *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 917 (Fed. Cir. 2005); *Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 445 (D.C. Cir. 1994).

At trial, Limelight timely moved for judgment as a matter of law based on the proper construction of the tagging term. *See* Dist. Ct. Dkt. Nos. 271, 274 (Rule 50(a) motion for judgment), 310 (Rule 50(b) motion for judgment), 345 (memorandum in support of Rule 50 motions). Akamai fully litigated tagging in its JMOL oppositions, in oral argument, and in competing claim construction arguments. Dist. Ct. Dkt. No. 343; A739-41; Dist. Ct. Dkt. No. 284. While the district court denied Limelight's requests, it never suggested, let alone held, that any of Limelight's argument had been waived. No case that Akamai cites finds waiver in comparable circumstances. *See*, *e.g.*, *Digital-Vending Servs. Int'l, LLC v. University of Phoenix, Inc.*, 672 F.3d 1270, 1278 (Fed. Cir. 2012) (affirming district court finding of procedural bar where party sought construction in conflict with stipulation); *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 640-41 (Fed. Cir. 2011) (affirming *district court's* finding of waiver under abuse-of-discretion standard); *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 889-90 (Fed. Cir. 2004) (argument waived on appeal when not raised before the district court).

Limelight also preserved its separate argument for new trial by formally requesting that the court charge the jury that, "according to the present invention, a virtual server hostname is prepended into the URL for a given embedded object." A20855. It did so twice in writing and once at the charge conference. *See* A21008-10; A739-41. Contrary to Akamai, Limelight was not required to object again after the judge charged the jury: where a party makes a clear request for a jury instruction, the judge rejects that request, and it all takes place on the record, then de novo review of that instruction applies. *See* Fed. R. Civ. P. 51(d)(1)(B); *Ji v. Bose Corp.*, 626 F.3d 116, 126 n.7 (1st Cir. 2010). In arguing to the contrary, Akamai relies on authority that, as the First Circuit itself has recognized, has been effectively overruled by the 2003 amendment of Rule 51. *See Ji*, 626 F.3d at 126 n.7; *Gray v. Genlyte Grp., Inc.*, 289 F.3d 128, 134 n.1 (1st Cir. 2002) (relying on *Davis v. Rennie*, 264 F.3d 86 (1st Cir. 2001)). Limelight repeatedly asked for a proper instruction on the meaning of "tagging" on the record, and the judge refused.

## II.   Limelight Does Not Infringe Because It Does Not Determine an Optimal Server

Akamai stipulated to claim constructions that defined "tagging" to mean "to specify a particular group of computers . . . from which an optimal server is to be selected." A17874. Akamai does not claim that its stipulation, by its plain terms, means anything other than that the

Mr. Daniel E. O'Toole
September 25, 2014
Page 4

CDN must select, not just a good server, but the *best* server. Akamai is not seeking to clarify what "optimal" means or to explain how optimal servers are chosen. Akamai's sole argument (at 5) is that it should be allowed to repudiate this construction by removing the word "optimal." It should not have been permitted to do so.

Furthermore, the patent specification provides no support for Akamai's argument. *First*, Akamai (at 5-6) is wrong that interpreting the claims as requiring the selection of an optimal server would read out of the specification an embodiment in which the DNS server returns a list of possible servers to serve the content. On the contrary, as Limelight demonstrated, the patent discusses a "list" of possible servers in the context of a "fault tolerance" mechanism that provides the next best server if the optimal server goes down and is no longer optimal. *See* '703 patent 13:2-4. Akamai does not dispute that this quotation is in the context of "fault tolerance." Nor can Akamai dispute that the patent always requires – even in the context of generating a list for fault tolerance – that the server is found based on traffic or other conditions. *See id.* 11:9-11 (determination of virtual server "continually updated based on network conditions and traffic in such a way to insure . . . fault tolerance"). Based on selected criteria, the purpose of the list is to identify *the* optimal server – something that Limelight's accused system does not do.

*Second*, Akamai selectively quotes (at 6) another statement in the specification that a "list of desired servers is assigned." *See* '703 patent 11:45-55. The generation of this interim list is part of a load balancing mechanism that is claimed in unasserted claims (such as claim 5) but is not found in the asserted claims. *See id.* cl. 5 ("wherein the second level name server includes a load balancing mechanism"). Akamai has never previously argued that this has anything to do with tagging an object to serve it from the optimal server.

*Third*, Akamai mistakenly argues (at 5) that, because dependent claim 20 states "for each embedded object, identifying one or more content servers from which the embedded object may be retrieved," the stipulated construction of tagging would make dependent claim 20 broader than independent claim 19. Not so: claim 19 requires that the object be delivered by the optimal (best) server; claim 20 requires, as an additional step, identifying a list of content servers from which the embedded object may be retrieved – that is, a list of possible servers from which the optimal server is chosen.

*Fourth*, Akamai argues (at 6) that the fact that there are multiple criteria used to choose the server demonstrates that these criteria define a "floor," not an optimal server. But, as we have shown, one can find the optimal server even if many different variables are compared to find that best server. In any event, Akamai cannot plausibly claim that anything above a "floor" counts as an optimal server, under any interpretation of that word.

### III. Dr. Ugone's Lost-Profits Testimony Was Inadmissible

Dr. Ugone's calculation of lost-profits damages should not have been admitted because (among other reasons) his calculation was based on the assumption that, had Limelight not


Mr. Daniel E. O'Toole
September 25, 2014
Page 5

offered supposedly infringing CDN services, Akamai would have captured Limelight's business in proportion to Akamai's overall market share. The calculation is thus deficient as a matter of law, because Akamai and Limelight offered service in distinct market segments. *See* Limelight Letter 7. Akamai's expert insisted that Akamai's service was dramatically more expensive than Limelight's because of quality differences. A505:117 (Akamai's system priced much higher because it "performs better"). And, as discussed further below, Akamai's expert *conceded* that an adjustment was required to reflect that price difference. Akamai cannot insulate this error from review by arguing that the decision to admit the testimony is reviewable for abuse of discretion, because the district court's *legal* error is, per se, an abuse of discretion. *See*, *e.g.*, *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014).

Akamai highlights rather than explains away Dr. Ugone's error when it repeatedly (at 7-8, 9) states that his 3% adjustment to Akamai's but-for market share was not only arbitrary in amount but unnecessary. Akamai cannot defend the district court's decision to allow Dr. Ugone to testify on the ground that the adjustment was unnecessary because Dr. Ugone himself testified that the adjustment was required due to the dramatic difference in price between Akamai's service and Limelight's. *See* Limelight Letter 7-8.

Dr. Ugone's calculation cannot be squared with his own acknowledgement that an adjustment for price differentials was required – he simply failed to carry through that adjustment and therefore came up with a grossly inflated and entirely arbitrary estimate of lost profits. *Id.* at 8-9. Indeed, if Dr. Ugone had made a 5% adjustment rather than a 3% adjustment (and performed his calculation in a manner consistent with his assumption), all damages would have disappeared. *See id.* at 9. Rather than try to defend the indefensible, Akamai points out another paradox that results from Dr. Ugone's arbitrary 3% adjustment – namely, that it suggests that Akamai would have had a lower market share if Limelight had *not* offered a supposedly infringing service in 2005. But that underscores that Dr. Ugone's approach was arbitrary; it does not make Limelight's criticism any less valid.

Akamai's argument that Limelight's objection to Dr. Ugone's inflation of his damages figure comes too late is likewise incorrect. There is no dispute that Limelight timely objected to the admissibility of Dr. Ugone's opinion on lost profits on the very basis that it now argues and timely moved for judgment on the basis that no evidence supported the lost-profits award. Limelight makes no legal argument now that it has not been making from the start.

           Sincerely,

           /s/ *Aaron M. Panner*

           Aaron M. Panner
           John Christopher Rozendaal
           Gregory G. Rapawy
           Michael E. Joffre

cc:  Counsel of Record